## W. M. Carter Planing Mill Co. *v.* New Orleans M. & C. R. Co. et al.

### [72 South. 884.]

1. Carriers. *Discrimination. Justification. Previous contracts.*

   The law is well settled by both federal and state courts, that contracts for interstate transportation at special rates, although entered into before the enactment of a law forbidding discrimination in freight rates, becomes void upon the enactment of such a statute.

2. Constitutional Law. *Impairing obligation of contracts. Application.*

   While the Federal Constitution, article 1, section 10, prohibits any state from passing a law impairing the obligation of contracts, this inhibition does not apply to acts of congress in dealing with interstate matters.

Appeal from the chancery court of Jones county.

Hon. Sam Whitman, Jr., Chancellor.

Suit by Will Carter Planing Mill Company against the New Orleans, Mobile & Chicago Railroad Company. From a judgment for defendant, plaintiff appeals.

The facts are fully stated in the opinion of the court.

*Whitefield & Whitefield,* for appellant.

All the counsel says about discrimination we admit to be sound law, but there can be no discrimination when there is no body to discriminate against. In other words, when the contract was made, it was, because of the two facts stated in the bill, and admitted by the demurrer, perfectly legal; and that the laws is, and counsel will not deny it, that if, when the contract was made, it was legal and valid, it cannot be made illegal or invalid by subsequent legislation or any subsequent change in public policy. That we are stating the law correctly let the authorities speak.

Green Hood on Public Policy, Rule 5, page 5, expressly declares that when a contract is valid when made, no subsequent statute or change in public policy can make it invalid.

In the case of *Stevens, etc.* v. *Southern Pacific Company,* 29 L. R. A. 751, it is decided that: "If for no other reason, this act of the legislature cannot be relied upon to assist respondents' case, for it was passed subsequent to the making of the contract, and, if the contract was valid when made, no subsequent act of the legislature can render it invalid."

It is laid down as an elementary principle in Green Hood on Public Policy, that if a contract conforms to the public policy of the state when made, a change in public policy will not avoid it. *Wilkinson* v. *Cook,* 44 Miss. 367; *Griswold* v. *Illinois Central Railroad Co.,* 24 L. R. A. 647. See note to *State* v. *Loomis,* 21 L. R. A. 789; See also *Laurel Cotton Mills* v. *Gulf & Ship Island Railroad Company,* 37 So. 134, showing that this rate was not a discrimination at all when made.

We submit to the court, therefore, with perfcet confidence that if the contract was valid when made, it cannot be made invalid by any law, change of the law, or any change in public policy, and was therefore a perfectly valid contract which can be specifically enforced.

This really ends this case, and makes the overruling of this demurrer necessary.

*Flowers, Brown, Chambers & Cooper,* for appellee.

These lumber shipments were interstate shipments, made as alleged in the bill in accordance with freight tariffs filed with the Interstate Commerce Commission. The contract under which this suit was brought was made an entered into January 8, 1907, with appellee as one party thereto and the Mobile, Jackson & Kansas City Railroad Company as the other. The property of the Mobile, Jackson & Kansas City Railroad Company was acquired by the appellee New Orleans, Mobile &

Chicago Railroad Company on December 1, 1909, and on January 10, 1910, the alleged contract was repudiated by it.

We have already quoted at length from the complainant's bill which proceeds upon the theory that since he held this alleged contract with the Mobile, Jackson & Kansas Railroad Company the rate could not be changed as to him and he should be permitted to reap the benefits of his contract. That he should be permitted to go on and operate under his contract at five dollars per car while others in the same business paid ten dollars and fifteen dollars per car for the same service. In other words to get directly at the gist of the proposition he ought to be permitted to stop cars at his plant for five dollars per car while others paid ten dollars for the same service, thus giving him, as he boldly asserts in his bill of complaint, an "advantage" over his competitors.

It is indeed surprising that the distinguished and learned counsel on the other side should seriously contend for such a proposition. To continue to carry out the terms of the contract would be to violate the spirit as well as the letter of the law, for it gave appellant an advantage over his competitors equal to from five to ten dollars per car. To insist on its continuance is to insist on the continued violation of the law and the receipt of an unlawful, unfair and improper rebate. Counsel seek to avoid this conclusion by saying that at the time this contract was made there was no other plant on the line and consequently no competition. Be all that as it may, at the time of the breach by appellee, other plants of a similar nature had been erected and were in active competition with appellant. The bill specifically alleges this, and states that this contract gave appellant a peculiar advantage over these competitors. Appellant seeks to justify this advantage possessed by him in the way of a special reduced rate by a reliance on his contract. This cannot be done. No

matter what his contract may have provided; no matter how valid and binding it may have been when entered into, the minute it became an instrument operating in favor of appellant and against his competitors, giving to the former an advantage over the latter in the way of a cheaper freight rate for the same class of service, it became null and void. Not only did it become null and void as a rate proposition but appellant would have placed himself in the criminal class if any advantage had been accepted under it. This case is almost identical with the Armour Packing Company case. In that case the Armour Packing Company made a contract with the C. B. & Q. Railroad Company. for the. transportation of a cargo of oil from Kansas City to New York. At the time the contract was made the rate was twenty-three cents per hundred pounds. Before the cargo moved, however, the rate was changed to thirty-five cents per hundred weight. Armour insisted on the twenty-three cent rate as provided in the contract regardless of the subsequent charge in the tariff. The Railroad Company acceded to the demand and protected the rate as provided in the contract. The shipment moved on the lower rate and Armour was indicted and convicted and fined fifteen thousand dollars. There was an appeal and the case was affirmed in the circuit court of appeals. 82 C. C. A. 135, 183 Fed. 1, 14 L. R. A. (N. S.) 400 and note. The action of the circuit court of appeals was affirmed by the supreme court. 209 U. S. 56, 52 L. Ed. 681, 28 Sup. Ct. Rep. 428.

The note writer in the note 14 L. R. A. (N. S.) 400 in commenting on the effect of the decision in the *Armour case, supra* says:

"The United States sureme court, in affirming the above decision—*Armour Packing Company v. United States*—has settled the law to be that a contract for .a freight rate less than the rate afterwards established by the carrier in accordance with. the provisions of the Interstate Commerce Act cannot be upheld on the

ground that, at the time the contract was entered into, the rate therein provided was the legally established rate." (52 L. Ed. 681.)

We refer to the Armour case and the notes thereon in 14 L. R. A. (N. S.) 400 and 52 L. Ed. 681, where all the authorities on the subject are collated, as furnishing ample authority to sustain the action of the chancellor in sustaining the demurrer to this bill.

It is contended by counsel that appellant constructed his plant on the line of appellee's road upon the strength of his contract for the rate. Perhaps he did. We have no reason to doubt this. But the Act of Congress of February 19, 1913, (ch. 708, 32 St. at Large 847), was in effect when his contract was made and of course read itself into it just as fully and completely as though set forth at length therein.

Counsel for appellant could have avoided the rash statement in their brief that "Wherever a contract is legal when made, it can never become illegal by virtue of the passage of any law by Congress"—by informing themselves that the law was in effect years before appellant made his contract. We are indeed surprised that learned counsel should make a statement of this kind even if the act itself had been passed by Congress subsequent to the making of the contract. The provisions in the Federal Constitution which prohibits any state from passing a law impairing the obligation of contracts does not extend to Congress. The inhibition extends only to the states and not Congress. The provision is that "No state shall pass any law impairing the obligation of contracts."

"This prohibition, it will be noticed, is directed only against the states, and there is no other clause in the Constitution laying a like inhibition upon Congress. If follows, therefore, that if congress should pass a law, falling within the scope of its jurisdiction, and not obnoxious to any other provision of the Constitution, the court would be obliged to sustain it, notwithstand-

ing its effect might be to impair the obligation of existing public or private contracts." Black Constitutional Laws, 605, citing authorities.

"The prohibition against passing any laws impairing the obligation of contracts is a limitation solely upon the state government and does not affect that of the United States." Putney on Constitutional Laws, 166. Citing authorities.

HOLDEN, J., delivered the opinion of the court.

This is an appeal from the chancery court of Jones county, where the appellant W. M. Carter Planing Mill Company filed its bill, claiming fifty thousand dollars as damages for the breach of a contract covering switching or stoppage charges on cars consigned to its mill at Laurel. A demurrer to the bill filed by the defendant New Orleans, etc., R. Co. was sustained by the lower court, and the complainant appeals here.

The appellant alleged in its bill: That on January 18, 1907, it entered into a contract with the appellee through the Mobile, Jackson & Kansas City Railroad Company which company was succeeded by the appellee, covering a dressing or planing of lumber in transit arrangement at Laurel. This contract, among other things, provided:

"That in all cases when the shipper may so direct, said direction to be inserted in the bill of lading covering shipment, the railroad company will deliver to the planing mill company, at its planing mill at said Laurel, all undressed lumber received by it for transportation over its said railroad to Laurel, and points beyond reached by its own rails, or the rails of its connection, to be planed or dressed at said mill and returned to the railroad company for further transportation: . . . Provided, however, that the rates herinabove provided for shall be subject to such change at all times as may be requried by the law, or the order of the railroad commissions, to the jurisdiction of

which the railroad company is subject, either state or Federal,'' etc.

That on or about January 8, 1910, the appellee railroad company failed and refused to carry out said contract. That one of the most important terms in said contract, and upon which it relied and rested, was the stipulation that the defendant would grant freight rates from points of origin to destination, and would only make a charge of five dollars per car for switching cars to complainant's plant, thus enabling complainant to compete with other such plants on the line of the railroad where the switching charge was from ten to fifteen dollars per car. That complainant was doing a large and profitable business by reason of the rate of five dollars per car for switching, and that its profit on each car by reason of such stipulated rate was from five to ten dollars, and that its business was largely increased over its competitors on other roads who were required to pay the larger shipping charge. That the denial of such rate to the complainant ruined and destroyed its then profitable and flourishing business. That complainant was doing a prosperous business, and its monthly profits were ten thousand dollars and that by reason of the advantage it had in the switching rate, its business would have steadily increased. The defendant railroad company demurred to the bill; and while the demurrer appears to be very lengthy, it really contains only one distinct ground, and that is, that the bill, on its face, seeks to enforce an illegal contract.

To state the case more briefly: The milling company had a written contract with the railroad company, providing that if the milling company would locate its plant on the railway line of appellee, and give its lumber hauling business to appellee, the appellee would furnish cars and shipping facilities to appellant at a certain rate of five dollars per car. This arrangement was entered into and carried out by the parties until

other planing mills were located along the railway of appellee, and after the enactment of the Federal Interstate Commerce Act, forbidding discrimination in freight rates, and providing a severe penalty upon the shipper and the carrier for the violation thereof. These lumber shipments in question in this case were interstate shipments and, of course, are governed by the laws enacted by Congress. When the Federal Interstate Commerce Act, forbidding discriminations in freight rates, became effective, as to the parties here, the appellee railroad company refused to further furnish appellant cars at the said five dollars rate agreed upon in the contract, for the reason that other shippers on the appellee's railroad line were charged a higher rate for the same service, and that to comply with the contract made with the appellant, in giving appellant the lesser rate agreed upon in the contract, would be a discrimination which is forbidden and made unlawful by the Federal act. But the appellant contends that, even though to carry out the contract between appellant and appellee would be a discrimination in freight rates, and unlawful, under the act of Congress, yet the appellant should be allowed to recover because the contract between appellant and appellee was legal and valid at the time it was entered into, as there was no discrimination at that time, and that it cannot be made illegal or invalid by subsequent conditions or legislation. That to deny to appellant the right to the discrimination in the freight rate under its contract with appellee would be "impairing the obligation of contracts" in violation of the Constitution. In other words, the appellant admits receiving a discriminating freight rate in violation of the Federal law, but contends that it should be allowed to continue to enjoy this special rate in violation of law because it had contracted for such rate before the law against discrimination became effective as to appellant. We can-

not agree with the contention of the appellant. The
contract entered into provides:

"That the rates hereinabove provided for shall be
subject to such change at all times as may be required
by the law, or the order of the railroad commissions, to
the jurisdiction of which the railroad company is sub-
ject, either state or Federal."

When the freight rate was fixed by the Railroad
Commission for interstate traffic, it appeared that the
rate charged to other shippers was greater than that
named in the contract between appellant and appellee,
and we think, under the terms of the contract, the ap-
pellee railroad could properly refuse to follow the old
rate given appellant under the contract and adopt the
general freight rate fixed by law. But regardless of
this latter provision of the contract, the law is well
settled by both Federal and state courts that contracts
for interstate transportation at special rates, although
entered into before the enactment of a law forbidding
discrimination in freight rates, becomes void upon the
enactment of the statute. In *Armour Packing Co.* v.
*United States*, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed.
681, the United States supreme court said:

"There is no provision excepting special contracts
from the operation of the law. One rate is to be
charged, and that the one fixed and published in the
manner pointed out in the statute, and subject to
change in the only way open by the statute. There is
no provision for the filing of contracts with shippers
and no method of making them public defined in the
statute. If the rates are subject to secret alteration by
special agreement, then the statute will fail of its pur-
pose to establish a rate duly published, known to all,
and from which neither shipper nor carrier may depart.
It is said that if the carrier saw fit to change the pub-
lished rate by contract, the effect will be to make the
rate available to all other shippers. But the law is
not limited to giving equal rates by indirect and uncer-

tain methods. It has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be, while in force, the only legal rate. Any other construction of the statute opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish.''

The note writer, in commenting on the *Armour Case, supra,* in 14 L. R. A. (N. S.) 400, says:

''The United States supreme court, in affirming the above decision . . . has settled the law to be that a contract for a freight rate less than the rate afterwards established by the carrier in accordance with the provisions of the Interstate Commerce Act cannot be upheld upon the ground that, at the time the contract was entered into, the rate therein provided for was the legally established rate.''

We find the same rule announced in Michigan Upper Peninsular Pig Iron Rates Matter, 26 Interst. Com. Com'n R. 284.

The act of Congress here in question was effective in February, 1903 (Act Feb. 19, 1903, ch. 708, 32 Stat. 847 [U. S. Comp. St. 1913, secs. 8597-8599]). At the time the contract was made between the parties in this case, 1907, it was the law, and should be read into it as if written therein. The law supersedes the contract, in so far as granting a discriminating freight rate, and renders it null and void.

While the Federal Constitution, article 1, sec. 10, prohibits any state from passing a law impairing the obligation of contracts, this inhibition does not apply to the acts of Congress in dealing with interstate matters. As to whether or not a state legislature could effectively impair the obligation of contracts by the enactment of a subsequent statute in a case of this kind, where the subject dealt with is affected with a public use and might come within the police power of the state, we do not express an opinion, but we do hold

here, following what seems to be the well-settled law on the subject in both state and Federal courts, that the appellant has no right to recover under the facts of this case, because his contract is illegal and void.

*Affirmed.*